Richard HOVENDEN, Appellant,

v.

Wallace TENBUSH et al., Appellees.

No. 15376.

Court of Civil Appeals of Texas, San Antonio.

Oct. 29, 1975.

Tinsman & Houser, Inc., Robert C. Scott, San Antonio, for appellant.

Beckmann, Stanard & Olson, Melvin A. Krenek, San Antonio, for appellees.

CADENA, Justice.

Plaintiff, Richard Hovenden, sued Wallace Tenbush, Ten Eleven Building Materials and Ten Eleven Company, referred to in this opinion collectively as "defendant," for damages resulting from the deterioration of the walls of plaintiff's building allegedly resulting from a defect in secondhand bricks purchased by plaintiff from defendant.[1] Plaintiff appeals from an order granting defendant's motion for summary judgment.

Jack Goebel Construction Company entered into a contract to construct a commercial building for plaintiff in San Antonio according to plans and specifications prepared by plaintiff's architect. The plans called for the use of a certain type of Mexican brick, or something similar thereto. Several samples of brick were inspected by plaintiff and his architect but these were rejected for one reason or another. Defendant, who was engaged in the business of selling building materials, including new and used bricks, invited plaintiff and his architect to examine some new bricks which defendant had available at his place of business. After plaintiff stated that these bricks were unsatisfactory because of their color, defendant stated that he had some bricks which were being cleaned out of a lot. Plaintiff and his architect went to a vacant lot near some railroad tracks and examined the bricks, which at that time were in the process of being cleaned. Subsequently, plaintiff took some of his prospective tenants to look at the bricks. Plaintiff decided that these bricks were of the right color, and plaintiff and the architect told the defendant that plaintiff would take the bricks if defendant could timely furnish the amount required by plaintiff. Plaintiff had knowledge of the fact that the bricks were used bricks.

Defendant delivered the bricks and plaintiff's building was completed with such bricks. Some time after the building was completed, the walls began to deteriorate, due to what plaintiff described as a "shedding" of the mortar.

Defendant, as movant for summary judgment, had the burden of demonstrating the absence of any genuine issue of material fact as to one or more of the factual elements of plaintiff's cause of action. *Gibbs v. General Motors Corporation*, 450 S.W.2d 827 (Tex.1970). Stated differently, the burden was on defendant to establish as a matter of law that plaintiff has no cause of action, and, therefore, all doubts as to the existence of an issue of fact must be resolved against defendant. *Parrott v. Garcia*, 436 S.W.2d 897 (Tex.1969). This merely means that we can accept as "facts" supporting the summary judgment only such facts as are conclusively established by the summary judgment "evidence."

We do not understand defendant's brief as asserting that the evidence conclusively negatives plaintiff's contention that the damage to his building was caused by a defect in the bricks furnished by defendant. In any event, there is evidence supporting plaintiff's theory and we must, under the applicable rules, assume that the damage to the building resulted from a defect in the bricks.

Plaintiff seeks to recover on theories of express warranty, implied warranty of merchantability, implied warranty of fitness for a particular purpose, and strict liability of a seller of chattels in tort.

The briefs of both parties, in discussing the liability of defendant for breach of express or implied warranty, rely on the warranty provisions of the Uniform Commercial Code applicable to the sale of goods. Secs. 2.314–2.316, Tex.Bus. & Comm.Code Ann. (1967). However, plaintiff's pleadings

---

1. Plaintiff also joined as defendant his contractor, Jack Goebel Construction Company, but plaintiff's suit against Goebel was sev- ered from plaintiff's cause of action against Tenbush, Ten Eleven Building Materials and Ten Eleven Company.

alleged, and the record establishes, that the building was completed prior to the adoption of the Code in Texas. Therefore, the question of defendant's liability on warranty theories is not affected by the provisions of the Code.

### Express Warranty

■ In his deposition, plaintiff declared: "[Defendant] represents that the bricks used in my building were of suitable quality to be utilized for building purposes. . . [Defendant was] aware that the bricks were going to be used for building purposes and at all times represented by . . . silence that they would be suitable for the purpose for which they were intended to be used. . . . At no time did [defendant] ever disclaim any responsibility or liability for the used bricks, but at all times represented them to be suitable for the purpose for which used bricks are to be used for building purposes." These quotations are taken from three successive sentences in the affidavit.

We do not view plaintiff's deposition as involving merely conflicting statements, in which case the inconsistency would, in itself, create a question of fact and compel the conclusion that defendant had not met the burden which rests on movants for summary judgment to establish the absence of material fact issues. Reading the three sentences together, plaintiff's affidavit can only be construed as averring that defendant's knowledge of the particular purpose for which the bricks were to be used, when considered in connection with defendant's silence and failure to make any express disclaimer, can reasonably be interpreted as an express affirmation, promise, warranty or representation that the bricks were suitable to be used for the intended purpose. Without questioning the validity of the inference which plaintiff seeks to draw from defendant's silence under the circumstances, we conclude that plaintiff's affidavit conclusively establishes the absence of an express warranty of fitness for a particular purpose. Without intimating that silence can never result in the creation of an express warranty, we are convinced that a purchaser who examines the goods and received no comment from the seller cannot successfully claim that the seller's silence created an express warranty. Cf. 3 Williston, Sales Sec. 20–7, p. 194 (4th ed. 1974).

### Implied Warranties

■ Since, as already noted, the sale with which we are concerned took place before the adoption of the Uniform Commercial Code in Texas, it becomes unnecessary for us to decide whether Secs. 2.314 and 2.315 of the Code, which deal with implied warranties, are applicable to cases involving sales of used articles. See *Chaq Oil Co. v. Gardner Machinery Corp.*, 500 S.W.2d 877 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); cf. 3 Williston, *op. cit.* Sec. 19–9.

Prior to the adoption of the commercial code in Texas, our courts uniformly held that no implied warranties arose in connection with sales of used goods purchased with knowledge of their second-hand condition. 26 Baylor L.Rev. 630, 634–37 (1974). As a matter of law, then, plaintiff cannot recover on a theory of implied warranty.

### Strict Liability in Tort

Sec. 402A, Restatement (2d) Torts (1965), imposes strict liability on "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property . . . for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or ultimate consumer without substantial change in the condition in which it is sold."

It is undisputed that defendant sold the bricks to plaintiff; that defendant was engaged in the business of selling used bricks; and that the bricks reached plaintiff without substantial change in the condition in which they were sold to plaintiff by defend-

ant. Defendant, however, asserts that Sec. 402A is inapplicable because the record establishes conclusively that the bricks were not "unreasonably dangerous" and because, in any event, Sec. 402A does not impose liability on the seller of used products, but only on the manufacturer.

■■ Defendant apparently relies on deposition testimony to the effect that the bricks in question were used in the construction of buildings of the Pearl Brewery, in San Antonio; that those buildings had been in existence for at least 31 years before they were demolished; and that the person who demolished the buildings and sold the used bricks to defendant noticed nothing different about the bricks as compared to other bricks. Even if we construe the testimony as establishing that during all these years there was no injury to the Pearl buildings traceable to a defect in the bricks, this does not conclusively establish the absence of a defect. The rule is that long-continued use of a product without injury to the user or his property does no more than create an issue of fact as to the defective condition of the product. 1 Hursh & Bailey, American Law of Products Liability Sec. 1:13 (2d ed. 1974).

■■ We find nothing in Sec. 402A, or in the accompanying comments, which suggests that the rule there announced is not applicable to dealers in used products. The liability is imposed on the seller of "any product." Neither the rule nor the commentary contains any language which can fairly be interpreted as making the rule applicable only to sellers of new products. In *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970) it was held that a manufacturer of a defective product was strictly liable to a purchaser who had subsequently purchased the product as a used product.

Defendant argues that a person who is injured by a defect in a product which he purchased as a used article can invoke the doctrine of strict liability in tort only against the manufacturer of the product. We are not persuaded.

The Restatement imposes liability on any person who "sells" a defective product which caused injury to person or property. According to comment f, the rule applies "to any manufacturer . . . to any wholesale or retail dealer or distributor, and to the operator of a restaurant." There is no basis for limiting the term "one who sells any product" to persons who sell products which they have manufactured.

Defendant does not here contend that a non-manufacturing seller of a defective new product which causes harm is not strictly liable. But in order to uphold defendant's contention, it is necessary to change "any product" to "any new product." The decision in *Gibbs* would then, of course, be obviously wrong. In order to avoid condemning the *Gibbs* holding, it would be necessary to add a proviso to the effect that, in cases involving injury from defective used products, only the manufacturer is to be subjected to strict liability, and to rewrite comment f so that, instead of reading "any manufacturer . . ., any wholesale or retail dealer or distributor," it would read, "any manufacturer . . ., and, where the product is sold as a new product, . . . any wholesale or retail dealer or distributor."

We do not interpret *Gibbs* as holding that in cases involving used products only the manufacturer can be held liable. The only question involved in *Gibbs* was the liability of the manufacturer. There is no basis for concluding that a holding that a manufacturer is liable is a holding to the effect that no other person in the chain of distribution of the product is liable.

Defendant calls our attention to the following statement by Dean Keeton, who has written extensively on the subject of strict liability: "The principle of strict liability has been regarded as applicable only when the product leaves the *manufacturer's*

hands in a defective condition." [2] (Defendant's emphasis.) Defendant insists that this statement supports the view that Sec. 402A imposes liability only on manufacturers. We disagree.

It is clear that Dean Keeton was addressing himself solely to the problem of the liability of the manufacturer. Clearly, the manufacturer who places nondefective product in commerce is not a person "who sells a product in a defective condition."

The only Texas case involving the non-manufacturing of a used product which we have found is *McLain v. Hodge*, 474 S.W.2d 772 (Tex.Civ.App.—Waco 1971, writ ref'd n. r. e.). There, the defendant *retail dealer* was held strictly liable for injury resulting from a defective rifle which he had sold as a used gun. *McLain* is, perhaps, distinguishable from the case before us, since there the defendant dealer had originally sold the weapon as a new firearm, and had repurchased the gun from the original purchaser before reselling it as a used article to plaintiff, and the Waco Court pointed out that there was evidence of probative force that the rifle was defective at the time the defendant sold it as a new rifle. 474 S.W.2d at 775. But, at the very least, this decision lends no support to defendant's contention that Sec. 402A imposes no liability on a non-manufacturing seller when the transaction involves the sale of a used product. *McLain* can fairly be interpreted as furnishing some support for the contention that the fact that defendant establishes that he sold the defective product as a used article does not preclude recovery under Sec. 402A.

We have found no case in which a court in Texas, or in any other American jurisdiction, has denied recovery under Sec. 402A because the transaction involved a used product where the facts would have supported recovery had the product been new. Admittedly, the cases involving second-hand products are not numerous.

The Supreme Court of Mississippi, in denying recovery under the doctrine of strict liability, observed that it knew of no case in which "the seller of a used product has been held liable for injuries resulting from the use thereof under the doctrine of strict liability in tort," as distinguished from liability under the doctrine of implied warranty. *Pridgett v. Jackson Iron & Metal Co.*, 253 So.2d 837, 840 (1971). Apparently, the court's research did not unearth the decision by the Texas Supreme Court in *Gibbs*. In any event, the defendant in *Jackson* was not within the reach of Sec. 402A, even if the product had been sold as a new product, because there was no evidence that the chattel was "inherently dangerous," or that, at the time of the injury, the product was being used for its intended purpose. 253 So.2d 841. It is, perhaps, significant, that the Mississippi courts have been reluctant to impose strict liability in tort on retail sellers, even where the transaction involves the sale of a new product, where the product sold by the retailer is in the same condition as it was when it left the hands of the manufacturer. *Sam Shainberg Co. v. Barlow*, 258 So.2d 242 (Miss.1972). [3]

In *Bombardi v. Pochel's Appliance & TV Co.*, 9 Wash.App. 797, 515 P.2d 540 (1973), hearing denied, 10 Wash.App. 243, 518 P.2d 202 (1973), the purchaser of a used article successfully invoked Sec. 402A in a suit against the manufacturer. This, of course, is the same result as that reached by our Supreme Court in *Gibbs*.

The only other two decisions involving used products by appellate courts which we have found were handed down by the Supreme Court of Oregon. In *Cornelius v.*

---

**2.** Keeton, Products Liability—Liability without Fault and Requirements of a Defect, 41 Tex.L.Rev. 855, 858 (1963).

**3.** The holding in *Ellis v. Rich's, Inc.*, 233 Ga. 573, 212 S.E.2d 373 (1975), that the doctrine of strict liability applies only to manufacturers, as distinguished from intermediate sellers, is clearly based on the peculiar provisions of the Georgia version of the Uniform Commercial Code. See, Ga. Code Ann. Secs. 105–106 (1968), quoted in 212 S.E.2d at 376.

*Bay Motors, Inc.*, 258 Or. 564, 484 P.2d 299 (1971), a judgment in favor of a used car dealer was affirmed on the ground that, under the evidence, the jury could have reasonably concluded that the claimed defect in the vehicle did not render it "unreasonably dangerous." Although the opinion of the court expressly states that the question of whether Sec. 402A is applicable is not being decided, the opinion, in a footnote, points out that Sec. 402A speaks of the liability of "[any] one who sells any product," and that the rule embodied in that section "by its terms is not limited to [the] sellers of new products." The footnote also reveals the fact that defendant was not relying on the fact that the vehicle in question was a used vehicle. 484 P.2d at 303, n. 4. The concurring opinion of Chief Justice O'Connell in this case lends some support to defendant's argument here, but discussion of such concurring opinion will be postponed until notice is taken of the opinion of the Oregon Supreme Court in *Markle v. Mulholland*, 265 Or. 259, 509 P.2d 529 (1973).

In *Markle*, the purchaser of a recapped tire sued the retailer, the wholesaler and the recapper (whom the court treated as the manufacturer of the recapped tire) to recover for personal injuries resulting from a blowout of the tire. The defect which caused the injury was not in the retread, but in the casing on which the new tread was placed. The evidence established that the casing, at the time of the recapping, had been in "use for the life for which it had been manufactured." Thus, the defect was in a used component of the product, and it is clear that the court treated the case as one involving a defect in a used product.

The case produced five opinions from the seven members of the Oregon Supreme Court, with five members of the court agreeing that Sec. 402A imposed liability on the manufacturer, the wholesaler and the retailer. The numerous opinions in the case reflect a disagreement concerning the basis for the doctrine of strict liability.

Three members of the majority took the position that Sec. 402A is based on two rationales, the theory of enterprise liability and "something similar to the rationale behind an implied warranty." 509 P.2d at 532. One concurring justice, rejecting the notion that liability under Sec. 402A rested on what he described as "two separate inconsistent bases," insisted that the sole basis for the doctrine of strict liability in tort is to be found in the theory of enterprise liability. 509 P.2d at 540.

In his concurring opinion, Chief Justice O'Connell again expressed the view, which he had stated earlier in his concurring opinion in *Cornelius*, that liability under Sec. 402A rested solely on "representational conduct" by the seller, and he repeated his conclusion that Sec. 402A is limited in its application by the implied warranty provisions of the Uniform Commercial Code. 509 P.2d at 536–39.

One dissenter would have ruled for defendants because he could find no basis for holding that the recapper, wholesaler and retailer "had impliedly represented that the used casing on the recap would perform as a new casing." 509 P.2d at 544. He then concluded that the seller of a used product is liable only for defects which he could have discovered by reasonable inspection. That is, the seller of a used product "is liable for negligence, and no more." 509 P.2d at 545.

The other dissident was unable to find any evidence that the tire was defective at the time it left the hands of any of the defendants. 509 P.2d at 547. In the course of his opinion he rejected the theory of enterprise liability as the basis for Sec. 402A, stating that, while that rationale "may be a fine economic theory, . . . it has no place in the law where the courts are seeking justice based on fault and innocence," and added that while that theory "may justify the rule . . . it cannot be the reason for creating it." 509 P.2d at 545.

In this case, since Texas adopted the Uniform Commercial Code after plaintiff's cause of action arose, we need not consider the question whether the implied warranty provisions of the Code had the effect of establishing an action in implied warranty as the sole remedy, in the absence of negligence or express warranty, available to a purchaser who has sustained injury as the result of a defect in a chattel which he purchased. The problem is discussed in Wade, Is Section 402A of the Second Restatement of Torts Preempted by the UCC and Therefore Unconstitutional?, 42 Tenn. L.Rev. 123 (1975).

The theory which lends the greatest support to defendant's position in this case is the representational theory advocated by Chief Justice O'Connell in his concurring opinions in *Cornelius* and *Markle*. His espousal of this theory, as enunciated in *Cornelius*, seems to be based on his conviction that since the Uniform Commercial Code deals with the subject of the liability of a seller of chattels, the judicial interpretation of Sec. 402A should be consistent with the legislative policy expressed in the warranty provisions of the code.[4] According to this theory, the question relating to the type of representation which a seller of used chattels will be deemed to have made is a question of law to be decided by the court, so that "A products liability case . . . is for the jury only after the court has determined what the seller in the particular type of sale impliedly represents as to the condition of the product. . . ." 484 P.2d at 308. The Chief Justice did not believe that a used car dealer can be "deemed to make a representation that the vehicle he is selling has brakes which are free from defects which could arise from normal use." 484 P.2d at 307.

It is clear from the exposition of the representational theory in *Cornelius* that the effect of adopting this theory would not be to establish a rule of thumb to the effect that sellers of used products are never strictly liable for injury resulting from defects in such products. At most, the Chief Justice's opinion in *Cornelius* suggests that the immunity of such a seller from strict liability extends only to defects which arise from normal use of the chattel. This conclusion is strengthened by the fact that he agreed that Sec. 402A imposed liability on sellers of used products where the evidence showed that the injury resulted from an inherent defect in the product, rather than from a condition brought about by normal use of the chattel.

The conclusion that Sec. 402A imposes liability only "within a framework of representational conduct" is, on its face, inconsistent with that section and its accompanying commentary, particularly comments c and m. Chief Justice O'Connell at least tacitly admitted as much when he charged, in *Markle*, that advocates of the enterprise liability rationale were confusing "the rule laid down" in the black-letter statement of the rule "in Sec. 402A with the commentator's explanation for the adoption of the rule," and added that there is "nothing to compel the conclusion that this rule is necessarily based upon the reasoning that the seller can best bear or shift the cost of injury, although this happens to be the explanation used in the comment." 509 P.2d at 538.

The attempted distinction between the black-letter statement of the rule and "the commentator's explanation for the adoption of the rule" suggests that after the adoption of the rule some anonymous commentator (actually, Dean Prosser) added his own gloss in the form of "comments." This

4. "The idea running through the implied warranty cases is that a seller . . . impliedly represents that the product meets the standard which an article of that type normally has in the market. We may assume that the legislature, . . . intend-ed to limit the seller's liability within this framework of representational conduct, however implied. If so, Sec. 402A must be similarly circumscribed." 484 P.2d at 306, 307.

suggestion cannot be unquestioningly accepted. Professor Wechsler, Director of the American Law Institute at the time that Restatement (2d) Torts was adopted, assures us that the commentary was "no less carefully examined and debated by the Advisers, the Council and the Institute than the black letter rules themselves." 1 Restatement (2d) Torts ix. The comments, then, were forged in the same crucible which produced the black-letter statement of the rule itself.

These comments were before the courts which have adopted Sec. 402A, and there is no reason for assuming that these courts were unaware of the fact that comment c clearly adopts the theory of enterprise liability as the basis for the rule.

Even if the representational theory[5] be accepted, the record before us does not establish as a matter of law that the alleged defect in the bricks resulted from normal use. Nor would the adoption of the enterprise liability theory compel the conclusion that the seller of a used product would be strictly liable for damage caused by defects which are the result of normal use of the article.

The conclusion that a seller of used products is not insulated from liability under Sec. 402A finds some support in, or, at least, is not precluded by, the language of that section and the accompanying commentary. Such a result is clearly supported, as applied to an intermediate seller, by the decision of the Oregon Supreme Court in *Markle*. Such a result is consistent with, if not in fact supported by, the decisions of our courts in *Gibbs* and *McLain*. Such a holding is not contrary to any definitive holding by any court of which we have knowledge,

and it finds support in the cases holding that lessors of defective chattels are strictly liable,[6] since in most lease cases the leased chattel is necessarily a used product.

The judgment of the trial court is reversed and the cause is remanded.

---

5. Adoption of the representational theory is not essential in order to avoid imposing on sellers the liability of insurers. The requirement that the product be defective effectively precludes the transformation of the seller into an involuntary insurer, especially when the phrase, "in a defective condition unreasonably dangerous to the user or consumer or his property" is interpreted to refer to a defect which would cause "a reasonable

person [to] conclude that the magnitude of the . . . perceivable danger *as it is proved to be at the time of trial* outweighed the benefits of the way the product was designed and marketed." Keeton, Product Liability and the Meaning of Defect, 5 St. Mary's L.J. 30, 38 (1973).

6. 1 Hursh & Bailey, American Law of Products Liability Sec. 4:30 (2d ed. 1974).